290 P.2d 682

Willis T. STEWART d/b/a Willis T. Stewart Realty Co., Plaintiff-Appellant,

v.

Stephen L. BROCK, Defendant-Appellee.

No. 5956.

Supreme Court of New Mexico.

Dec. 1, 1955.

Milton S. Seligman, H. Leslie Williams, Albuquerque, for appellant.

Irwin S. Moise, Lewis R. Sutin, Albuquerque, for appellee.

LUJAN, Justice.

This is an action to recover a commission for services rendered by a broker in procuring a purchaser for real estate and neat cattle owned by defendant. The case was tried by jury which returned a verdict in favor of defendant and plaintiff appealed. The parties will be referred to as they appeared in the district court.

The facts of the case are substantially these: On Febraury 13, 1951, Willis T. Stewart, a licensed broker, plaintiff-appel-

lant, wrote a letter to Stephen L. Brock, defendant-appellee, the last paragraph of which reads:

" * * * I am enclosing a form that properly executed will serve as a preliminary study of your ranch as to price, however, I would not attempt to set a selling figure without inspecting it. In case you care to consider marketing your property, I suggest you fill out this form and avail yourself of my services which will be without either expense or obligation to you. If I do represent you, my commission of 5% will be, as in the past, so efficiently earned that you will have no regret in using me as your agent. I would appreciate an answer no matter how little you may be interested."

On July 16, 1952, the defendant wrote plaintiff a letter (enclosing therein a listing of his property), which is as follows:

" * * * A very near neighbor informed me two days ago of his interest to work out a deal with me on his ranch. He is planning to retire and has offered to let me have his ranch at a figure we agreed upon.

"In order to handle this trade in a manner that seems right, I am interested in selling some of my property west of Mills, N. Mex. It is a dandy little ranch and you might have a buyer for the property.

"My understanding is that your commission is 5%. I would like to have you inspect this ranch immediately provided it would involve no expense or obligation to me. I am asking that this matter be treated strictly confidential as I have made no effort to sell it nor contacted anyone else as of this date.

"Mr. Stewart:

"The Mills ranch is located about 35 miles from where we live. We now have an opportunity to buy adjoining land and for this reason are considering selling our Mills property."

"Ranch Description

"Name and address of owners: Stephen L. Brock
 Roy, N. Mex.

"Location: Mills ranch that I may decide to sell is located 5 miles west of Mills, N. Mex.

Acreage:
Total Fee Land 1120 State Leases 640
6720 Federal
 Taylor Grazing Forest Other 4960

Waterings: Ranch is watered by three wells—one 80′ deep. Springs and 5 miles of Canadian river, New 8 & 10′ Airmotor Mills

Pastures and Fences:
 6 separate pastures
 Good boundary and cross fences

Description of Headquarters and other buildings:
There is only a camp on this ranch. I do have a splendid site with a wonderful watering set-up—good wind well, etc. REA, etc. Where it would be ideal location for headquarters.

Type of country and forage: Around ~~3000~~ 3426 acres lies out on the flats and approximately 3300 acres in bottom-canyon land lying up and down Canadian river.

Cultivated land: 84 acres terraced field.
Annual Moisture: 15 inches
Elevation: 5800′
Mineral Rights: All
Annual carrying Capacity: (In case of Forestry or Taylor Grazing Permit, give the actual number of head)
155 head set by govt—conservative figure

Shipping Point: Mills, New Mexico

Remarks: This is a dandy cattle ranch with excellent watering facilities. The canyon pasture is ideal for wintering young cattle or mature cows."

On July 24, 1952, pursuant to above letter, the plaintiff in company with Kenneth Mims, his real estate agent, drove to defendant's place and there, together with the defendant, inspected said ranch. After inspecting the ranch a discussion was had with defendant regarding the price thereof. Defendant at that time thought maybe

he could get $75,000, but plaintiff and his agent were of the opinion that the ranch could be sold for $65,000. Shortly thereafter Mims showed the ranch to William D. Durio, a prospective purchaser, and later introduced him to the defendant. Subsequently defendant and Mr. Durio discussed the possibility of a sale of the ranch together with 150 cows and 6 bulls, but nothing definite was arrived at.

On August 16, 1952, the defendant wrote plaintiff as follows:

" * * * While in Albuquerque last Monday I talked with both Bill Durio and Kenneth Mims. It was my understanding from Bill that he would be in a position to let me know what he might do by this weekend. If convenient, please check with him and let me know if he wants to come back up and work out something.

"With our living close by—we could easily operate this ranch for him for a year or two if he would care to stay in Albuquerque and remain in the service."

On August 19, 1952, the plaintiff wrote defendant as follows:

" * * * Just a line to let you know that our deal with Bill Durio isn't progressing any too well. He called me from Las Cruces and informed me that everything was working out just fine and it didn't look as though he was going to have any trouble raising the money to go through with the deal to buy your ranch. At this time he talked as though he planned on going right ahead with the deal.

"He then called me again Sunday upon his return from Las Cruces and seemed to have cooled off alltogether. He said that he had received some advise from a rancher friend and that he had advised him against buying the ranch as he thought it to be too high due to the limited amount of deeded land.

"I plan on going to see Bill again tonight and I will attempt to overcome any resistance that I can however from my conversation with him Sunday I don't think that the chances are too good. I will let you know if anything else develops."

And on August 29, 1952, plaintiff again wrote the defendant as follows:

" * * * Bill Durio called us today stating it appears that you and he may make a deal, presuming he can make his financial arrangements. He feels that he can get this done. I judge from his remarks that he expects in the very near future to be able to put up sufficient money to bind the contract.

"His understanding is that you are selling him the ranch and 150 two-year

old heifers plus 6 bulls for $85,000.00. These heifers are to be topped out. I am merely repeating this in order that there will be no misunderstanding.

"Bill should know, or rather we should know in the near future as to whether he will be able to do as he anticipated, and we will keep you posted. If there are any suggestions that you have, please let us know so that we can do all possible to expedite the sale."

As the negotiations were going on between the defendant and Mr. Durio for the sale of defendant's ranch and cattle, Mr. Durio did not have the $20,000 in ready cash for the down payment on the deal, but would have had it by the time the transaction was to be closed, to-wit, December 1, 1952. The defendant knew this. As a matter of fact, prior to the time the contract was drawn by Mr. Modrall, the defendant made a trip to Las Cruces with Mr. Durio and there saw the property that Durio was going to dispose of to raise the money to close the deal with defendant.

After reaching an agreement on the sales price of the land and cattle, the parties went to the office of Mr. J. R. Modrall, Albuquerque, New Mexico, to have him draw the proper papers regarding said sale. On October 31, 1952, Mr. Modrall drew the following papers which were signed and acknowledged by the defendant, his wife, and Mr. Durio: Warranty deed from Stephen L. Brock and Jean H. Brock, his wife, in favor of William D. Durio; a relinquishment of grazing lease covering state lease; chattel mortgage from Durio to Brock, securing principal indebtedness of $19,100 and secured by mortgage on 150 cows and 6 bulls; a note for $19,100 from Durio to Brock; a bill of sale signed by Brock to Durio covering the cattle. It was understood and agreed by and between the respective parties that all of these instruments would be retained by Mr. Modrall until such time as Mr. Durio would pay Brock the down payment of $20,000, not later than December 1, 1952, at which time Mr. Modrall would deliver the same to the parties. Mr. Modrall told the parties, using his own words as follows:

"* * * At my suggestion, the contract was signed on that occasion in my office rather than waiting until later and the understanding was then, I gave no-one a copy of the contract; I explained to both of them that the contract would not be delivered, and in my opinion would have no legal binding affect on either of them, until such time as it was delivered and that when both of them called me on the phone—which was contemplated to be sometime after the middle of November—that at that time, I would deliver the signed contract to each party, send all of the other escrow papers to the

Roy Bank, and go ahead and distribute the papers."

Mr. Durio paid the defendant $2000 on the day the contract was signed, but he does not remember whether it was before the contract was signed or afterwards. The record also discloses that sometime during the early part of November the purchaser went to defendant's ranch and there branded all of the cattle hereinabove referred to with his brand and at that time gave the defendant $5,000 which he kept. Four or five days thereafter Durio telephoned the defendant and told him that something of a personal nature had come up and he would not be able to go through with the deal.

"* * * Q. What happened on the deal with Mr. Brock? A. Shortly after we branded the cattle something of a personal nature came up and I felt because of that I would not be able to go ahead and go through with the deal. First I phoned Steve and explained the situation to him and two or three days later I drove up to his ranch at Roy and at that time *we agreed to* call the deal off.

"Q. Did you have enough money at that time that you could have made the down payment? A. At that particular time, no, sir, I did not have, but I would have when it became due on the 1st of December.

"Q. Would you please state what you said and what Mr. Brock said in your conversation with him in connection with your not going through with the deal? A. Yes, sir. I explained why I felt I wouldn't be able to go through with the deal. The payments I had already given him amounted to $7000 and first I asked him if he would be willing to let me have $7000 worth of cattle, and he said it would be impossible for him to do so. So then I asked him if we could call the deal off and wanted to know if he would be satisfied with just $7000. He told me he would not be, so then I suggested that had he required me to put up a 10 per cent forfeit on the contract when I first signed the contract, it would have amounted to $8500, and so using that as a figure he finally agreed if I would send him $1500 more he would consider the contract null and void and the whole deal would be off."

On November 6, 1952, the plaintiff wrote defendant as follows:

"* * * Bill Durio informs us that his deal with you has, by mutual consent of each of you, been called off. He also informs us that he has paid you $7,000.00 and is to pay you an additional $1,500.00 to release him from the agreement to purchase your ranch and cattle.

"Naturally, under the circumstances which encompass our selling of your ranch and cattle to him, and the money that you have received, we expect to be paid our commission. I imagine that you have anticipated this and expect to make a prompt refund for it.

"I hesitate to quote you the law pertaining to this as I have no right to believe but what you have intended to satisfy our claims in your settlement with him. The law, however, is that a Realtor is entitled to his full commission when the deal is made. This you can confirm with your own attorney, if you need to do so. I hope to hear from you at once."

On November 24, 1952, the plaintiff again wrote a letter to the defendant regarding his commission, as follows:

"* * * On November 6th I wrote you concerning our commission on the sale of your ranch to Bill Durio and as yet I have had no reply. Due to the fact that you have been paid there is no reason that you cannot settle with us at once. I hope that this letter gets the desired results in order that it will not be necessary to take further steps."

On November 28, 1952, the defendant wrote plaintiff as follows:

"* * * Your letter of November 6 was duly received.

"At the time Bill Durio and I traded (verbally) in late August, he *ask* me to go ahead and buy the feed and lay it in at our Chicosa ranch. Acting in good faith I contracted for him one car 41% cake and all the bundles that I could get from Warner Fluhman, a farmer near Mills. These, together with other commitments I made, based on my trade with Bill, I've had to work out.

"Bill Durio has not paid me the $1500.00 which he has written will be sent soon. When it is received you may expect a check from me.

"We have been snowed in here since last Sunday night. The road to Roy has been blocked with 3 ft. of snow and no mail or school busses have been running. We're feeding hay and cake heavy and hope the weather will warm up soon."

On December 10, 1952, the plaintiff wrote defendant:

"* * * I received your letter of Nov. 28 stating that you would forward us our commission for the sale of your ranch as soon as Bill Durio sent you the other $1,500.00 that he had promised you. He has informed us that this has been remitted to you therefore I am anticipating that you will at once pay the $2,500.00 that I

agreed with you and Bill would be the commission for the deal.

"I surely regret for Bill's sake that this all resulted so badly for him and am much impressed with the *boys* sense of integrity."

On December 15, 1952, defendant wrote plaintiff:

" * * * On coming home Saturday I found that Bill had sent check for $1,500.00. Enclosed you will find check for $212.50. I have written Mr. J. R. Modrall, Albuquerque regarding an opinion on this case and just as soon as a reply is received you will be notified.

"We have been having ideal weather this week and most of our snow is melted."

On December 19, 1952, plaintiff wrote defendant:

" * * * In view of your failure to pay the $2,500.00 in connection with your transaction with Mr. Durio in which we acted as broker, taking together your statement to Mr. Mims and your letter received today tendering check for $212.50, we have decided to refer the entire matter to our attorney, Mr. Milton Seligman, First National Bank Building, Albuquerque, New Mexico. We are returning to you this check for $212.*40*.

"Mr. Modrall has advised our attorney that he will not represent anyone in connection with this matter, and that he will so notify you, therefore, we realize that you will be delayed for a few days in obtaining an attorney's opinion.

"In view of the $8,500.00 forfeiture collected from Mr. Durio, and in view of the matters mentioned in the first paragraph above, we hereby notify you that we do not consider ourselves bound, under the circumstances, to accept less than our full $4,250.00 and that our offer to accept $2,500.00 as a commission is hereby withdrawn."

The plaintiff at the close of all of the evidence moved the court for a directed verdict, in words and figures as follows:

"At this time, the plaintiff would like to make a Motion that the Court direct a verdict in this case for the plaintiff on the ground that all of the written and oral evidence submitted to the Court established the two facts which are necessary for recovery. First, that there was a binding contract between the plaintiff and the defendant to sell this property, and, second, that there was a binding contract between the defendant and Durio for the sale of this property which would in this case entitle the plaintiff to his commission, and we ask the Court to rule

that there is no question of fact for the Jury at all in this case, it is solely a question of law for the Court to decide, and we would ask the Court to direct a Jury to bring in a verdict in favor of the plaintiff for the sum of $4,250.00.

"We would like to make another Motion for a directed verdict, your Honor, on the same grounds as the previous Motion, and ask that a verdict be directed for plaintiff for the sum of $2,500.00."

 As to the first ground set forth in the motion for a directed verdict, we are of opinion that the correspondence by letters between plaintiff and defendant, relating to the finding of a purchaser for defendant's ranch and to the commission to be paid constituted a binding contract between them, and the interpretation of such a contract was a question of law for the court and not a question for submission to the jury to determine. Buxton v. Colver, 102 Kan. 871, 171 P. 1158; W. C. Tyrell Trust v. Lovell, Tex.Com.App., 27 S.W.2d 142; Doe v. Eggleston, 106 N.J.L. 565, 146 A. 175. The contract of employment in the instant case being complete and clear, is as conclusive upon the parties as if it had been reduced to a single writing in the most solemn form.

 When the plaintiff, pursuant to above correspondence, brought the land owner and the prospective purchaser together, and they after negotiating with each other came to an oral agreement (which was thereafter reduced to writing), as to the purchase price, commission, and the date upon which the down payment should be made before the deal was to take effect, the land owner could not thereafter by accepting $8,500.00 from the purchaser on the down payment, mutually agree among themselves to call the deal off and thereby defeat the plaintiff of his commission.

 It is well settled that a broker has earned his agreed commission when he produces a prospect who is ready, willing and able to purchase on terms agreeable to the seller, Williams v. Engler, 46 N.M. 454, 131 P.2d 267; Wilson v. Sewell, 50 N.M. 121, 123, 171 P.2d 647; Simmons v. Libbey, 53 N.M. 362, 208 P.2d 1070, 12 A.L.R.2d 1404. This is precisely what happened in this case.

When the land owner accepted the prospect produced by plaintiff as a purchaser, the broker's right to commission became fixed. Simmons v. Libbey, supra.

As to the second ground urged by plaintiff in his motion for a directed verdict, we are of opinion that the right to commission

226

was not contingent upon the actual consummation of the deal between the purchaser and defendant, but became complete when the broker produced a buyer able, ready and willing to purchase the ranch on terms fixed by the land owner. The negotiations must have been proceeding according to the terms prescribed by defendant and considered binding in the minds of the parties, otherwise the purchaser would not have paid the land owner $7000 and agreed to pay him an additional $1500, or 10% of the purchase price, in order to procure a cancellation of the negotiations.

In view of the foregoing, the judgment is reversed, the cause remanded to the district court with directions to set aside its judgment and to enter a judgment for plaintiff in the sum of $2500 and costs, an amount which the plaintiff himself virtually concedes to be an adequate commission in view of the circumstances here present.

It is so ordered.

COMPTON, C. J., and SADLER, McGHEE and KIKER, JJ., concur.