382 P.2d 707

**SOUTHWEST MOTEL BROKERS, INC. and C. B. Snyder National Realty Co., Plaintiffs-Appellees,**

**v.**

**ALAMO HOTELS, INC., Defendant-Appellant.**

**No. 7183.**

Supreme Court of New Mexico.

May 6, 1963.

Rehearing Denied June 27, 1963.

W. A. Keleher, T. B. Keleher, John B. Tittmann, William B. Keleher, Albuquerque, for appellant.

J. C. Ryan, Hannett, Hannett & Cornish, Albuquerque, for appellees.

CHAVEZ, Justice.

Plaintiffs-appellees filed suit against defendant-appellant, Alamo Hotels, Inc. and E. B. McKinley, alleging that after some negotiations between appellee, Southwest Motel Brokers, Inc., by its president, W. E. Hoyt, and appellant, Alamo Hotels, Inc., through its president, E. B. McKinley, that appellee, Southwest Motel Brokers, Inc., in conjunction with appellee, C. B. Snyder National Realty Company, at the request of appellant, Alamo Hotels, Inc., produced through their efforts a buyer, ready, willing and able to purchase all of the stock of appellant, Alamo Hotels, Inc., for the sum of $1,000,000 net. It is further alleged that appellees and appellant, on June 21, 1960, entered into an agreement to purchase and upon this agreement appellees base their claim. Appellees asked judgment in the sum of $50,000.

Appellant and E. B. McKinley moved to dismiss the complaint on the grounds: (1) That the nature of the action is a suit for payment of brokerage commission; (2) that appellees are not licensed real estate brokers within the state of New Mexico; and (3) that under § 67–24–19, N.M. S.A., 1953 Comp., the action is illegal and unlawful. The motion was denied.

Appellant and E. B. McKinley then filed their answer, denying the allegations of the complaint and alleged, as an affirmative defense, that their attorneys disapproved the contract.

The cause was tried by the trial court and a jury and, at the conclusion of the case, the trial court directed the jury to re-

turn a verdict in favor of appellees in the sum of $50,000.

Both parties submitted requested findings of fact and conclusions of law and the trial court made its findings of fact and conclusions of law. Judgment was entered for appellees and against appellant, Alamo Hotels, Inc., in the sum of $50,000, together with interest and costs. The judgment decreed that appellees recover nothing from E. B. McKinley. From the judgment, appellant, Alamo Hotels, Inc., duly perfected this appeal.

Appellant, Alamo Hotels, Inc., is a New Mexico corporation which owns and operates the Desert Aire Motor Hotel in Alamogordo, New Mexico. It stock is owned by E. B. McKinley of Alamogordo, Don Lee and Charlie Lee who live on their ranch approximately 70 miles southeast of Alamogordo, Henry Thygeson of Albuquerque, and P. M. Crawford of El Paso, Texas. The record is not clear as to the exact time, but early in 1960, W. E. Hoyt, president of Southwest Motel Brokers, Inc., contacted E. B. McKinley, president of Alamo Hotels, Inc., with reference to the possible sale of their motel. McKinley advised Hoyt that if he came up with anything that might be acceptable, that he would see whether a deal could be made, and that if Hoyt could obtain a deal of $1,000,000 net that he, McKinley, would present it to the board of directors. Hoyt did present several offers which were not interesting to McKinley and at one time, in the Spring of 1960, Hoyt went to El Paso or Alamogordo, expecting to meet a prospective purchaser who, it appears, did not show up. On March 17, 1960, McKinley wrote to Hoyt, submitting certain information requested by Hoyt in a telephone conversation, and further stated in said letter:

"Please remember that as of now I have no authority from the Board of Directors to list this property for sale, however the Board has indicated their willingness to consider any proposal your client may wish to make."

In due time McKinley was advised of a proposal to purchase by Julius Epstein and Associates. This proposal was from C. B. Snyder National Realty Company and contained in their letter signed by Max Seigel, addressed to W. E. Hoyt, president of Southwest Motel Brokers, Inc., dated May 5, 1960, as follows:

"In reply to your letter of May 2nd, I have procured a firm offer for the above mentioned motel and restaurant fee, cocktail lounge, etc., of $1,050,000 with $250,000 in cash.

"The fee is to belong to our people thereby eliminating the $1,000 a month expense and the lounge lease with Jerry Wolfe is to be executed in addition to the restaurant lease.

"This offer is subject to all figures given by you being checked, verified and substantiated.

"The first mortgage is to be approximately $250,000. at 6% interest and $25,000. a year payout. The balance as a second mortgage is to be for $550,000. at 4% interest and no amortization until the first mortgage is paid out, or a new mortgage is procured. At that time it is to be understood that the total payments per annum for interest and amortization shall not exceed $65,000. on any new mortgage procured and any remaining balance as a 2nd mortgage.

"If this offer is acceptable, please advise me and I will arrange to bring my people, their attorney and accountant to meet with you and the owners at the Desert Aire Motel to check out the figures and draw contracts.

"It is understood that if this sale is consummated with our people your office and our office are to share the prevailing local Real Estate Board rate of commission on a 50-50 basis."

On June 20–21, 1960, Hoyt, Seigel and Epstein's representative Manuel Weinberger, met McKinley at the Desert Aire Motor Hotel in Alamogordo. There were discussions regarding Epstein's offer between the parties for two days and, at the conclusion thereof, the following handwritten agreement was executed:

"June 21/1960

"Alamo Hotels Inc.
"Att'n Mr. E. D. McKinley Pres.

"Gentlemen:

"This is to advise you that our client has made us a firm proposal, to purchase 100% of the stock of the above mentioned Corporation, which is to include the Desert Aire Motel and its fee, all of its equipment, furniture and all other assets, but free and clear of any liabilities, liens and encumbrances, with the exception of a New 1st Mtg. to be placed by you at no expense to our client, for $800,000 at 6% Int. total payments including interest shall not exceed $60,000 per annum until paid, our client is to pay you $250,000 in cash. You are to warrant that all taxes are paid up to date, including Income taxes. The liquor license is to be transferred to our client at no cost.

"This offer is subject to the attorneys for both parties approving the Contracts.

"There shall be no personal guarantee by our client on the first Mortgage.

"In the event this deal is accepted Southwest Motel Brokers Inc. and C. B. Snyder National Realty Co. Inc. are to be recognized as the brokers in this transaction, the brokerage is to be $50,-000 payable in the following manner.

$7,500 to CBS Nat'l Realty Co. Inc. & $7,500 to Southwest Motel Brokers Inc. at time of closing of title, and $35,000 at 1% Int. paid to each above at the rate of $2,500 per annum until paid.

"We herewith tender you a C. B. Snyder Realty Co. Inc. check #585—Hudson Trust Co. Hoboken, N. J. for $5,-000 on behalf of our client as evidence of good faith and additional amount to be agreed upon will be paid upon signing of Contracts, this check is not to be used until figures are checked and Contracts signed; said Contracts to be signed 15 days from date. It is also understood the figures of Income and expense given to Mr. W. E. Hoyt by you are to be substantiated and approved by our client.

"Yours,

"Southwest Motel Brokers Inc.

"/s/  W. E. Hoyt, Pres.

"C. B. Snyder National Realty Co. Inc.

"by  /s/  Max Seigel V. P.

"Accepted by

"Alamo Hotels, Inc.

"by  /s/  E. B. McKinley, Pres."

McKinley testified that Seigel and Hoyt signed the agreement, probably on June 21, 1960, but that he did not sign it at the same time because he was not authorized to do so by the board of directors. At that time there was a discussion as to how to contact the board of directors. Later, McKinley and Weinberger flew to the Lee ranch and consulted with Don and Charlie Lee as to the transaction and as to the contents of the agreement. McKinley also consulted Crawford and thereafter McKinley signed the agreement.

On July 7, 1960, Max Seigel, vice president of C. B. Snyder National Realty Company, wrote to E. B. McKinley, president of Alamo Hotels, Inc., as follows:

"Mr. Epstein and his associates were prepared to come out on Wednesday, July 6th to sign contracts in accordance with our agreement dated June 21, 1960. On Friday last we spoke to Mr. Hoyt on the telephone and he advised us to make reservations which we did. On Tuesday Mr. Hoyt called to tell us that your attorney was out of town on a vacation and would not be back until July 20th at which time an appointment could be set for the closing of the deal. Mr. Hoyt also advised that you were sending a telegram giving us this extension but to date we have not received it from you.

"I am therefore writing this letter to advise you that we will be in Albuquerque at your attorney's office on July 20th to close this deal. Will you please confirm this appointment."

On or about July 20, 1960, McKinley, accompanied by Don Lee and Henry Thygeson, went to Albuquerque and consulted with their attorney, W. A. Keleher, with reference to the agreement. McKinley testified that after this conference Keleher advised McKinley "to write a letter to Mr. Seigel explaining that there was no deal; that our attorneys had not approved the contract." On July 20, 1960, Keleher telephoned Seigel and, on the same day, wrote the following letter to him:

"Your letter of July 15th, addressed to E. D. McKinley, Pres., Alamo Hotels, Inc. at Alamogordo, New Mexico, has been referred to me for attention.

"As I told you on the telephone, the transaction in which you are interested cannot go forward, this being my legal advice and opinion rendered pursuant to request from client. I have this day instructed Mr. McKinley to return the $5,000 check direct to you. Mr. McKinley was requested, so I am advised, not to cash the check, but this would have made no difference one way or the other. As to the commission, I regret to advise you that I have also rendered an adverse opinion in regard to this."

On July 25, 1960, McKinley also wrote to Seigel, saying:

"Pursuant to instructions from attorney W. A. Keleher of Albuquerque, I am returning to you herewith check for $5,000.00 dated Hoboken, N. J., June 21, 1960, drawn on Hudson Trust Company payable to Alamo Hotels, Inc., signed C. B. Snyder Realty Co., Inc., Special Account No. 2, Max Seigel.

"This check was left with me with the request that it should not be cashed and upon conditions and instructions, and is now returned to you in good faith in accordance with your wish. Please acknowledge receipt and oblige."

McKinley testified that he believed that in a telephone conversation with Hoyt he told him that, on advice of attorneys, they were not going to sell. No reason was given as to why the transaction could not go forward and no contracts were prepared as called for in the agreement. On redirect examination by Mr. T. B. Keleher, McKinley testified as follows:

"Q. I will try to get around to the back door, Your Honor. Now, don't answer this question. Had you been led or was it your own mental frame of mind that by signing this agreement that subject to your attorney and the attorneys for Mr. Epstein reviewing the agreement to see if both sides could live with the agreement from the tax position or from other standpoints, did you then sign the contracts?

"MR. CORNISH: Same objection.

**234**

"MR. KELEHER: On that question, I would like to argue the law.

"THE COURT: I will permit him to answer it.

"A. Would you repeat that, sir?

"Q. Was it your mental intention, based upon the statements made to you that if you signed this agreement that it would not be binding or effective until the attorneys for Alamo Hotels and Mr. Epstein had a chance to review the contents and see if they could live with it?

"A. That is right.

"THE COURT: Now, do you mean, Mr. McKinley, this contract, this handwritten instrument?

"THE WITNESS: Yes, sir.

"THE COURT: That that was to be submitted to your attorneys and was not binding until they had approved it?

"THE WITNESS: Yes, sir. If the Court will permit me, I can explain why.

"THE COURT: No, I don't want to go any further than Mr. Keleher has gone. He goes far enough. That will be all, sir."

Mr. Max Seigel testified:

"Q. Were there discussions between all of you pertaining to the sale?

"A. Yes. That was the sale of the stock of the corporation. And, Mr. McKinley was to deliver the stock of the corporation, if we had an agreement, and all of its assets which included the liquor license, the go-carts, and bus that he uses back and forth from the air port; the whole business.

"Q. Now, did Mr. McKinley participate in those discussions?

"A. Yes, sir.

\*  \*  \*  \*  \*  \*

"Q. Would you look at the agreement which you drew up and does that say which is to include the Desert Aire Motel and its fee?

"A. That's right.

"Q. What do you mean by its fee?

"A. It includes the land, the equipment, Desert Aire Blankets, carts, everything that belonged to the operation of the Desert Aire, this is what this means.

"Q. So, you were going to buy the land and the building?

"A. We weren't buying the land. Mr. McKinley was to throw that in with the package. He had some kind of a side deal. I don't know what it was.

"Q. Now, you weren't buying the land, he was throwing it in?

"A. He was putting it through the corporation. He had it out of the corpo-

ration which he was getting a thousand dollars a month for it. And we told him or Mr. Epstein told me that he could not accept that deal. So, Mr. McKinley agreed to put that into the deal and relieve—and for the same purchase price.

\*    \*    \*    \*    \*    \*

"Q. And, if you couldn't have gotten the land, you weren't interested in the deal?

"A. That is right.

"Q. And, your commission was based upon commission prevailing for a real estate broker's commission?

"A. That is right."

Seigel also testified that his principal in the transaction was Julius Epstein; that he was being paid by appellant who retained them, through McKinley as president.

Don Lee testified that on or about June 21, 1960, McKinley and Weinberger came to his ranch and that he and his son, Charlie Lee, discussed with them the contents of the agreement. Don Lee also testified:

"Q. Now, did you and Mr. McKinley have any discussion in front of Mr. Weinberger about the contents of that agreement?

"A. I am sure we discussed it very thoroughly; that it was a good deal for us.

"Q. Now, did you, yourself, or Mr. McKinley question or ask Mr. Weinberger about the sentence in this contract that reads, 'This offer is subject to the attorneys for both parties approving the Contracts.'

"A. I am sure we discussed it.

\*    \*    \*    \*    \*    \*

"Q. The question was, Mr. Lee, what did Mr. Weinberger say, if anything, about that particular sentence?

"A. Well, I don't think that I can say that Mr. Weinberger discussed that sentence alone. I am sure Mr. McKinley and myself and my son discussed that together. Does that answer your question?

"Q. No. What did Mr. Weinberger himself, not Mr. McKinley or your son, what did he have to say, if anything about that particular provision of the contract?

"A. As I remember it, he agreed that it had to be approved by our attorneys.

"Q. If your attorneys or his attorneys didn't approve of the deal, was there a deal?

"A. I don't think so.

"Q. Was that the impression you got?

"A. That's right."

Charlie Lee also testified that about June 21, 1960, McKinley and Weinberger visited

him and his father at their ranch and that they discussed the contents of the agreement. Charlie Lee was asked:

"Q. Do you recall if he [Weinberger] said anything in particular about the sentence that reads, 'This agreement is subject to approval of the attorneys for both parties.'

"MR. CORNISH: It doesn't read that way, if the Court please.

"MR. KELEHER:

"Q. 'This offer is subject to the attorneys for both parties approving the Contracts.' Did Mr. Weinberger offer any explanation or say anything about that?

"A. Yes. That this would explain it, that it would be subject to the attorneys for both parties—

"Q. Did he go on to the question of supposing one or both attorneys disapproved the contract, what would happen?

"A. I don't recall.

\*     \*     \*     \*     \*     \*

"Q. Was your understanding after the entire discussion that if Mr. McKinley signed this agreement in behalf of the corporation that it was subject to the review by the attorneys for Alamo Hotels?

"A. Yes, sir."

Mr. Weinberger testified that he is a licensed attorney but not engaged in the practice of law; that he is the assistant of Julius Epstein who is engaged in investing in real estate businesses and general investments; that he looks after the operation of certain of Epstein's properties and properties of other people associated with Epstein; that he looks into new offerings submitted, and does generally what is required of him in the furtherance of Epstein's investment business. Weinberger also testified:

"Q. Was there a conversation at that time between yourself and either of the Lees or Mr. McKinley relative to the contents of this agreement?

"A. A general conversation, yes.

"Q. And, in specific, were you asked to interpret or explain what was meant by the phrase 'This offer is subject to the attorneys for both parties approving the Contracts.'

"A. I believe it was part of our general conversation, yes.

"Q. Do you recall off hand what explanation, if any, you gave about that particular phrase?

"A. It was that the contract, it would memorialize or bring this transaction to fulfillment would have to be drawn by the attorneys. And, it would be drawn in such a way so as to give both parties the maximum benefit. There

was some concern on the part of Mr. McKinley, and I believe the Lees also as to the effect that the tax consequences would have. And, I explained that we would work with them; our attorneys would work with their attorneys to effect a contract that would enable both parties to have the maximum benefit possible."

Appellant's first point asserts that the trial court erred in denying its motion for a directed verdict on the ground that the transaction involved the sale of real estate and that a suit for commission by a non-licensed broker is barred by law. Appellant cites §§ 67–24–19 and 67–24–33, N.M.S.A., 1953 Comp., which provide:

"67–24–19. Enactment and prohibition clause.—On and after the effective date of this act it shall be unlawful for any person, copartnership, association or corporation to act as a real estate broker or real estate salesman within this state without a license issued pursuant to the provisions of this act [67–24–19 to 67–24–35] by the New Mexico real estate commission."

"67–24–33. Suit by broker or salesman.—No action for the collection of commission or compensation earned by any person as a real estate broker or salesman required to be licensed under the provisions of this act [67–24–19 to 67–24–35] shall be maintained in the courts of the state unless such person was a duly licensed broker or salesman at the time the alleged cause of action arose. In any event suit against a member of the public as distinguished from any person licensed under this act shall be maintained only in the name of the broker."

Appellant contends that the agreement involved a going-business operation, including the Desert Aire Motel and its fee, all of its equipment, furniture and other assets, free and clear of all liabilities, liens and encumbrances, with the exception of the new first mortgage for $800,000 at 6% interest. Appellant argues that the provision in the agreement to purchase 100% of the stock of appellant corporation is mere form and that, in substance, the agreement involved the sale of the Desert Aire Motel, including the land and buildings, and was a real estate transaction within the meaning of § 67–24–33, supra.

The difficulty with appellant's argument is that, regardless of the fact that the land upon which the motel is located is involved in the agreement, there is no evidence in the record that appellees were not licensed real estate brokers.

Appellant contends, however, that the case was tried upon the assumption that appellees were not licensed real estate brokers in New Mexico and directs our attention to the letter written by appellees'

attorneys to the trial judge on January 6, 1961, in which the statement is made:

"Mr. Keleher has asked us to advise you that the plaintiffs were not licensed as brokers in the State of New Mexico. This is correct."

This letter was written while the trial court was considering appellant's and McKinley's motion to dismiss and, thereafter, on March 15, 1961, the motion was denied.

Counsel for appellant says that the fact that appellees were not licensed in New Mexico had been duly stipulated and that appellees' letter of January 6, 1961, should be made a part of the record. We do not so understand the stipulation. It provides that prior to deciding the motion to dismiss filed on November 16, 1960, the attorneys for appellees advised the trial judge in writing, by letter of January 6, 1961, that appellees were not licensed as real estate brokers in New Mexico.

The record is devoid of testimony of any nature that appellees were not licensed real estate brokers in New Mexico. Based upon the evidence, the trial court refused appellant's and McKinley's requested findings of fact that appellees were not licensed real estate brokers in New Mexico and that appellees may not maintain an action in New Mexico for the payment of commission for the sale of real estate.

The trial court concluded that appellees were not estopped to assert their cause of action and that appellees' commission is not within the provisions of § 67–24–19, supra.

The burden was upon appellant and McKinley to establish by evidence in the record that appellees were not licensed real estate brokers in New Mexico. Since no evidence was introduced establishing this fact, there is no evidence in the record from which the trial court could have concluded as a matter of law that appellees could not maintain their action. Neither the stipulation nor the letter was in evidence at the trial and hence we are clear that we cannot consider the stipulation or the letter of January 6, 1961. See Hamilton v. Doty, 71 N.M. 422, 379 P.2d 69.

Appellant's next contention is that a jury question was presented as to the existence of any contract and that the trial court erred in directing a verdict for appellees.

Under this point appellant contends that the sentence in the contract—"This offer is subject to the attorneys for both parties approving the Contracts." is ambiguous and that the agreement was not effective or binding until approved by appellant's attorneys. Appellant argues that it should have been permitted to introduce evidence that it was the intention of the parties that the agreement was not binding until it had been approved by the attorneys for both parties, and that a material issue of fact existed which should have been submitted

to the jury for determination. Appellant and McKinley offered to prove:

" * * * that it was an intention of all parties that this agreement would be reviewed by attorneys for both sides, and if the attorneys for either side had objections to the proposal as outlined that there would be no offer that had been accepted; * * *."

The trial court held that the contract was clear and unambiguous and that no testimony would be received to contradict or vary its terms. The trial court concluded that the contract is to be construed by the court as a matter of law. The trial court found that on June 21, 1960, appellant entered into an agreement to sell all of its stock of the corporation to Julius Epstein and Associates for the sum of $1,050,000 and to pay the sum of $50,000 commission for the sale of the stock; that appellees produced a purchaser who was ready, willing and able to purchase and who was accepted by appellant as ready, willing and able to purchase; that on or about July 20, 1960, appellant advised appellees that the transaction could not go forward; that no reason was given by appellant to appellees for the refusal of appellant to consummate the transaction; that appellant never prepared or presented contracts to the purchaser or appellees; that the agreement was breached by appellant on or about July 20, 1960. The trial court concluded that appellant accepted the purchaser as ready, willing and able to

purchase the stock of appellant corporation; that the refusal of appellant to go forward with the transaction was arbitrary and unreasonable; that appellant, as principal, owed a duty to its agents, appellees, to assert reasonable efforts to consummate the transaction; and that appellant did not act in good faith toward appellees.

Since no attack is made by appellant upon the findings of the trial court, the facts found are the facts upon which our decision is based. Hinkle v. Schmider, 70 N.M. 349, 373 P.2d 918.

Even though the trial court held that it would not permit parol evidence to vary the terms of the agreement, and also refused the tender of proof made by appellant and McKinley, the trial court permitted testimony by McKinley, Don and Charlie Lee, and Weinberger, as to the intention of the parties and held:

" * * * The only thing which I believe could be questioned as to whether or not the contract is unambiguous or otherwise, is the line reading, quote, 'This offer is subject to the attorneys for both parties approving the Contracts.' It is my conclusion by that sentence the parties meant that the attorneys who represented both purchaser and sellers would collaborate in the preparation of the final document; that the form in which those final documents were to take would have to be

approved by both attorneys for both parties and that they would be ready for signature within fifteen days from the date of this instrument. * * * "

■■ Based upon the evidence and construing the contract as a whole, we hold that the trial court was correct in holding that the contract was unambiguous and binding between the parties, and that the interpretation of the contract was a question of law for the court and not a question for submission to the jury to determine. Stewart v. Brock, 60 N.M. 216, 290 P.2d 682; 156 A.L.R. 602.

As hereinbefore stated, the trial court found that no reasons were given by appellant for their refusal to consummate the transaction; concluded that the refusal by appellant to go forward with the transaction was arbitrary and unreasonable, and that appellant did not act in good faith toward appellees.

■■. The standard of conduct between a broker and his principal is set out in 12 C.J.S. Brokers § 95(2), p. 222, as follows:

"With some exceptions, the right of a broker to the agreed compensation or damages measured thereby is not defeated by the refusal of the principal to complete or consummate a transaction. To be available and sufficient to defeat liability for the broker's commission, the grounds of the principal's refusal to complete a transaction must be valid and substantial and be stated at the time of refusal."

See also, 8 Am.Jur., Brokers, §§ 141, 181, pp. 1066–1067, 1096–1097.

Appellant's point III claims error in that the agreement called for the purchase of 100% of the stock of appellant corporation, which was to include the Desert Aire Motel in its entirety, and was not approved by the corporation's stockholders as required by § 51–2–31, N.M.S.A., 1953 Comp. This section provides that in the sale of assets of a corporation in this state, not less than two-thirds of the stockholders shall consent at a special meeting of the stockholders.

■■ Although during the trial, in argument between counsel on a motion to strike certain testimony, appellant's attorney stated that if the entire assets of a corporation are to be sold the consent of the stockholders must be obtained, this issue was likewise never raised and no ruling by the trial court on this issue was invoked. No evidence was presented or requested on this issue and, therefore, the question was not preserved for review. Supreme Court Rule 20(2), (§ 21–2–1(20) (2), N.M.S.A., 1953 Comp.). We might also add that appellant's claim under this point is that of illegality, which is an affirmative defense and must be pleaded. Section 21–1–1(8) (c), N.M.S.A., 1953 Comp.

Appellant's point IV is that the court erred in concluding as a matter of law that appellee's right to a commission was not contingent upon the consummation of the sale. This issue also was not raised at the trial and no ruling was invoked in order to preserve the question for review. The trial court concluded that appellees were acting as agents for and as brokers for appellant and, that upon acceptance of the agreement, appellant became obligated to appellees for their commission. The agreement and the evidence all support the trial court's conclusion. The agreement provides that in the event the deal is accepted, appellees are to be the recognized brokers in the transaction. Appellant accepted the agreement. Appellees produced a buyer, ready, willing and able to purchase and, as the trial court concluded, that upon acceptance of the agreement by appellant, by and through its president, McKinley, appellant became obligated to pay appellees their commission, and that appellees' right to a commission was not contingent upon consummation of the sale.

Appellant's point V claims error in the trial court's conclusion of law that McKinley was authorized to sign the agreement on behalf of appellant. Again, under this point, no ruling was invoked of the trial court by appellant as to McKinley's lack of authority to execute the agreement. The issue was neither pleaded, as is required under an affirmative defense, nor raised during the trial. No objection was made to the trial court's conclusion on this point. Hence, this question cannot be considered by us on appeal.

Appellant's point VI claims that the trial court erred in refusing to find that the proposed agreement was indefinite and incapable of performance. The trial court found that appellees produced a purchaser who was ready, willing and able to purchase. This finding was not attacked and hence it is a finding upon which this decision is based. No evidence was presented by appellant that any of the stockholders did not consent to the transaction. In fact, one of the stockholders testified "that it was a good deal for us."

It should be noted that where both parties to an action request the trial court to direct a verdict in their behalf, findings of fact and conclusions of law must be made unless waived. Goldenberg v. Village of Capitan, 53 N.M. 137, 203 P.2d 370. Thus, it follows in this case that we are bound by the trial court's findings of fact and conclusions of law, unless they are attacked.

Finding no error in the record, the judgment of the district court is affirmed.

It is so ordered.

COMPTON, C. J., and CARMODY, J., concur.